**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| Ultra Form Mfg. (2021) Inc., | ) | |
| | ) | |
| and | ) | Case No. 3:24-cv-1922 |
| | ) | |
| Kailash (Kacee) Vasudeva, | ) | Judge |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Jury Trial Demanded |
| vs. | ) | |
| | ) | |
| Dana Limited, | ) | |
| | ) | |
| Defendant. | ) | |

## Complaint

For its complaint against defendant Dana Limited ("Dana"), plaintiffs Ultra Form Mfg. (2021) Inc. ("UF") and Kailash (Kacee) Vasudeva ("Vasudeva") (collectively, "Plaintiffs") state:

## Summary of Case

1.      Dana is a behemoth company that supplies automotive components and assemblies to automotive original equipment manufacturers (OEMs), such as General Motors.

2.      During the COVID epidemic in 2020, Dana was in danger of losing one of its struggling suppliers to insolvency: Ultra-Form Mfg. Co. Ltd. ("Ultra-Form"). Dana did not want to switch to a different supplier because doing so would require Dana to incur millions in costs to recertify the parts for its automotive customers, a process called "pre-production part approval process" (PPAP), and switching suppliers also posed logistical and reputational challenges for Dana.

3.      Rather than do the right thing—by either bailing out its supplier or incurring the cost to switch suppliers—Dana decided to foist the risks, costs, and burdens of their

problem onto Vasudeva. It concocted a scheme to get through this tumultuous period in a way that minimized the risk and cost to Dana: induce Vasudeva to buy Ultra-Form by promising to give him a lot of business, and then neglect its promises after things calm down because Vasudeva is too small relative to Dana to push back.  This would allow Dana to keep its supplier unchanged (at least from the perspective of its automotive customers) and maintain profits through the pandemic.

4.      But Vasuveda was not so easy to convince and initially balked at the idea. So Dana repeatedly lobbied him to change his mind, promising to maintain existing levels of business, doubling down on its promise to deliver millions of dollars in additional business, and guaranteeing him the right of last refusal to bid on other Dana business. These repeated promises over months finally induced Vasudeva to purchase Ultra-Form.

5.      But Dana's promises were false when made: Dana never intended to follow through with them, and it never has, costing Vasudeva and his company millions of dollars in damages and unjustly enriching Dana.

6.      Plaintiffs now seek to hold Dana accountable and seek the millions in damages that they have suffered due to Dana's false promises.

**The Parties**

7.      Plaintiff Ultra Form Mfg. (2021) Inc. ("UF") is a Canadian corporation, headquartered in Ontario, Canada. It manufactures and sells machined components for automobiles.

8.      Plaintiff Vasudeva is a Canadian citizen, who resides in Canada. He is the Chief Executive Officer and part owner of UF.

2

34393671.2

9.      Dana Limited is an Ohio limited liability company headquartered in Maumee, Ohio. It supplies parts and assemblies to automobile manufacturers. Dana Limited is a subsidiary of Dana Corporation, which is publicly-traded company. Dana Corporation is a corporate juggernaut: it generated over $10.6 billion in sales in 2023.

## Jurisdiction and Venue

10.      This Court has diversity jurisdiction over this civil action under 28 U.S.C. § 1332 because the matter in controversy exceeds $75,000 and is between an Ohio company, on the one hand, and citizens of a foreign state (Canada), on the other hand.

11.      This Court has personal jurisdiction over Dana at least because it is an Ohio company with headquarters in this state.

12.      Venue is proper under 28 U.S.C. § 1391 because Dana is subject to personal jurisdiction in this district under Ohio law and, therefore, "resides" in the Northern District of Ohio according to federal law.

## Relevant Facts

### Dana Solicits Vasudeva for Help.

13.      Vasudeva is a highly experienced, well-respected Canadian businessman who has invented, designed, and manufactured products and tools for the automotive industry for decades. He was a board member of the Automotive Parts Manufacturers' Association for ten years, Canada's national association of original equipment manufacturers servicing the worldwide automotive industry, and remains a member.

14.      Vasudeva also is a gifted innovator and has obtained many patents, including over 50 issued U.S. patents, to his unique and valuable inventions.

34393671.2

15.     In early 2020, the emerging COVID-19 pandemic was causing disruptions to Dana's manufacturing supply chain.

16.     On February 24, 2020, Reynold Noronha, a Senior Purchasing Manager for Dana, contacted Vasudeva for help.

17.     On February 27, 2020, Noronha met with Vasudeva and Rishabh Agnihobri, a sales manager for Vasudeva's Maxtech group of companies.

18.     During that meeting, Noronha explained that Ultra-Form, a key supplier to Dana that provided approximately 480 parts, was financially distressed, and that Dana was concerned Ultra-Form would be unable to continue meeting its future supply obligations to Dana.

19.     Noronha also told Vasudeva that replacing a supplier that manufactures and supplies 480 parts would be extraordinarily difficult and costly for Dana.

20.     As part of the standards set by North American automobile manufacturers, any change in the manufacturer of a part triggers a necessary pre-production approval process ("PPAP").

21.     In this case, the cost of PPAP per part would have been approximately $10,000 and per assembly was approximately $50,000.[1] If Ultra-Form were to go out of business, Dana would have incurred significant costs – potentially exceeding $15 million – to obtain PPAP for the approximately 480 parts supplied to Dana by Ultra-Form.

22.     Additionally, at the outset of the COVID-19 pandemic, automobile manufacturers had advised all tier 1 suppliers (like Dana) that the manufacturers would be unable to verify PPAP and the suppliers therefore should avoid any supplier changes.

---

[1] Unless otherwise noted, all dollar amounts presented in this complaint are Canadian dollars.

23.     The emerging COVID-19 restrictions would also have made transportation of parts from new suppliers extremely unreliable.

24.     In addition, apart from the foregoing considerations, the failure of Ultra-Form would have caused grave damage to the reputation of Dana in the eyes of the automotive manufacturers it supplied and jeopardized future business for Dana from the OEMs.

25.     Given the hundreds of parts supplied by Ultra-Form, its failure would have threatened Dana's ability to fulfill its existing commitments to automobile manufacturers.

26.     From Dana's perspective, a change in Ultra-Form's ownership would not trigger the need for PPAP certification, however, as there would be no change in the manufacturing process, thereby enabling Dana to avoid the significant financial and reputational risks to Dana outlined above if Ultra-Form were to go out of business, and Dana had to find a different supplier for its approximately 480 parts.

27.     This is where Vasudeva came in. Noronha was already familiar with Vasudeva and knew that he had the needed expertise, as Vasudeva was the CEO of another Canadian manufacturing company, Specialty Innovations and Manufacturing Ltd. ("SIM"), an associate company of Maxtech Manufacturing, which was another of Dana's approved suppliers and which was a competitor of Ultra-Form. Noronha also knew that if Ultra-Form went out of business, much (if not most) of Dana's existing business with Ultra-Form would likely have then gone to SIM instead.

28.     Indeed, Noronha even sent SIM a list of all volume parts (totaling 239 part numbers) and all service parts (totaling 240 part numbers) then being supplied by Ultra-Form for SIM to quote.

5

29.     But transferring the business from Ultra-Form to SIM would have required new PPAP for all parts, which Noronha and Dana wanted to avoid.

30.     During the February 27, 2020 meeting, Noronha asked Vasudeva to purchase Ultra-Form instead, in order to stabilize it financially and so that Dana would not need to change suppliers and incur the costs and risks outlined above.

31.     Noronha also provided Vasudeva contact information for Ultra-Form's then-owner and encouraged Vasudeva to undertake a site visit of Ultra-Form's facility, which was located outside Toronto.

32.     Vasudeva had little interest in purchasing Ultra-Form. He already was the CEO of four family-owned Canadian companies, SIM and other non-automotive companies, which were in close geographic proximity to Ultra-Form's manufacturing facility and competed for the same business.

***Vasudeva declines to purchase Ultra-Form.***

33.     At Noronha's urging, Vasudeva nonetheless visited Ultra-Form's facility in March 2020.

34.     Vasudeva found the Ultra-Form facility generally utilized aging, out-of-date equipment and technology that would require significant financial investment to upgrade.

35.     Though Vasudeva had little appetite to purchase Ultra-Form, Noronha, as agent for Dana, spent months trying to persuade Vasudeva to purchase Ultra-Form.

36.     In addition to the aging equipment and technology that would need significant upgrading, Vasuveda had concerns about Ultra-Form's monthly sales, which averaged only around $320,000 in 2020 and dropped as low as $250,000 per month at times.

34393671.2

37.     On May 9, 2020, after doing initial due diligence, Vasudeva and his representatives told Dana that a purchase of Ultra-Form would not be economically viable.

38.     Specifically, Vasudeva and his representatives told Dana that just to break even, Ultra-Form's sales would need to average approximately $450,000 per month, and for Vasudeva to be interested in purchasing Ultra-Form, Ultra-Form's sales would need to average at least $525,000 to $550,000 per month.

***Dana urges Vasudeva to reconsider and makes promises it never intended to honor to induce Vasudeva.***

39.     On June 8, 2020, Vasudeva and Noronha had a meeting during which Noronha urged Vasudeva to reconsider his decision to not buy Ultra-Form.

40.     During that meeting, Noronha told Vasudeva that if he went through with the purchase of Ultra-Form, Dana would order another additional $2 million a year in parts ultimately bound for Rivian and GM's BEV3 vehicles. Unknown to Vasudeva, neither Noronha nor Dana had the intent of following through on that promise.

41.     Based in significant part on Noronha's representations that Dana would commit to purchasing another $2 million per year of parts from Ultra-Form if Vasudeva went forward with the purchase, on June 11, 2020, Vasudeva told Noronha that he would consider purchasing Ultra Form.

42.     That same day, Noronha emailed Vasudeva a draft 4-year supply agreement.

43.     Throughout the summer of 2020, while Vasudeva again considered purchasing Ultra-Form, Noronha continued to send numerous additional emails and made multiple phone calls to Vasudeva to encourage him to close the purchase of Ultra Form.

44.     At various times, Noronha also included his supervisor and Dana's Global Senior Director for Purchasing, Tony Jones, in the purchase discussions with Vasudeva.

45.     Vasudeva, however, continued to harbor serious doubts about whether the purchase of Ultra-Form made business sense. In particular, Vasudeva remained concerned about the low sales volumes and the capital infusions that would be necessary to modernize Ultra-Form's facility and equipment.

46.     To induce Vasudeva to purchase Ultra-Form, Dana, through Noronha and other representatives, continued to make representations about guaranteed purchase levels from Ultra-Form and awarding new business for Ultra-Form.

47.     Dana also provided Vasudeva with sales projections for Ultra-Form that were manipulated, false, and artificially inflated, which made the business deal appear more lucrative that reality.

48.     Noronha also promised that Dana would involve Ultra-Form in bids for COVID-19-related products such as personal protective equipment and medical equipment.

49.     Noronha again promised in a September 20, 2020 email that Dana would purchase an additional minimum of $2 million in products from Ultra-Form.

50.     Still unconvinced he could make the purchase economically viable, on September 21, 2020, Vasudeva emailed Noronha and said that he was going to walk away from the Ultra-Form purchase.

51.     Vasudeva informed his team on September 23, 2020 that he was going to pass on purchasing Ultra-Form.

52.     Vasudeva reiterated his decision to walk away from the deal in a September 28, 2020 phone call to Noronha.

53.     Noronha responded via email on September 30, 2020, once more confirming that Dana would continue the existing business with Ultra-Form, award Ultra-Form $2 million

8

in additional annual business, and grant Ultra-Form the right of last refusal to bid on parts within the scope of its capabilities, *if* Vasudeva completed the purchase of Ultra-Form.

54.     To help seal the deal with Vasudeva, Noronha invited Vasudeva and members of his team to join an October 2, 2020 face-to-face meeting in Oakville, Ontario in Dana's office with him and other Dana representatives, including Kurt Long, Daphne Qiu Hong, and Steven Monte, an executive on the Canadian side of Dana's operations.

55.     During that meeting, Vasudeva again explained his concerns regarding the purchase of Ultra-Form, including the financial losses expected during the transition in ownership, Ultra-Form's low sales levels, and the costs necessary to make required improvements to Ultra-Form's equipment.

56.     Vasudeva made it clear during that meeting that he could not accept any financial losses because of this deal, especially during those uncertain times, as it could jeopardize his other businesses and thereby his family's financial security.

57.     The Dana representatives reaffirmed Noronha's prior representations that Dana would continue its existing business with Ultra-Form, help build sales by adding new business to get to at least $450,000 per month in sales revenue, and introduce Ultra-Form to other divisions of Dana for new sales opportunities, among other things. Based on Dana's repeated representations, Vasudeva relented and agreed to work on a proposal to purchase Ultra-Form and to become a long-term, active partner with Dana.

34393671.2

***Vasudeva relies on Dana's false promises and agrees to buy Ultra-Form***

58.     In December 2020, Ultra-Form (2020) Ltd.[2] and Dana signed a Long-Term Supply Agreement (the "LTA"). The LTA has a confidentiality clause, and thus Plaintiffs have not attached it to this complaint, but will file it under seal at the appropriate time with leave of Court.

59.     The LTA stated it was "based on the takeover of full right, title and ownership of Ultra-Form Manufacturing Ltd. (the current Supplier) by Ultra-Form (2020) Ltd."

60.     Vasudeva signed the LTA on behalf of his company Ultra-Form (2020) Ltd.

61.     Noronha signed the LTA on behalf of Dana as its Senior Purchasing Manager.

62.     The LTA was to run for four years and then automatically renew for another four years.

63.     Among other things, the LTA stated that it applies to products listed in an Exhibit A and "will extend to include new business subsequently awarded by Dana," which the LTA defined as the "Products."

64.     The LTA required Dana to (a) maintain specified levels of monthly purchases from UF for six months after the takeover, (b) purchase 100% of its and its affiliates requirements for the Products, (c) provide UF "with the opportunity and assistance to quote all Dana and Affiliates business that is within [UF's] documented ability to supply products with high quality, competitive pricing, and other related requirements," and (d) provide UF with a "right of last refusal … prior to [Dana] making a sourcing decision."

---

[2] Ultra-Form Mfg. (2021) Inc. succeeded to the rights and obligations of Ultra-Form (2020) Ltd. under the LTA.

65.     Unknown to Vasuveda at that time, Dana never intended to perform these obligations.

66.     On March 17, 2021, Vasuveda purchased the assets of Ultra-Form through his company Maxel Manufacturing Company Inc., which was renamed Ultra-Form Mfg. (2021) Inc.

***Dana breaches the LTA and fails to provide the sales to UF that it promised.***

67.     Within the first six months of the LTA, Dana breached the LTA by failing to provide even the mandatory base level of monthly purchases from UF.

68.     Making matters worse, Dana failed to purchase the $2 million in new annual business that it promised UF, and, upon information and belief, Dana has obtained at least some of that business from other suppliers in violation of I.a of the LTA.

69.     Dana also denied repeated requests by Vasudeva and UF to visit Dana facilities in order to advise on which parts UF could supply, in clear breach of Dana's obligation under the LTA to give UF the "opportunity and assistance" to bid on such business. This breach was especially harmful to UF because Vasudeva is a skilled designer and inventor, with a knack for designing better components at better pricing, and thus having the opportunity and assistance to review parts purchased by Dana to provide competing bids for new business was a critical term that induced Vasudeva to purchase Ultra-Form to allow UF to meet the sales numbers that it needed to recoup its investment and stay out of the red.

70.     Dana also breached the LTA by failing to provide UF with the "right of last refusal" on purchase of parts that UF was capable of providing.

71.     Another example of Dana's dishonesty and breaches of its promises and contractual obligations is part 77-1049. In 2022, Noronha sent UF an opportunity to supply part 77-1049, which was valued at about $1.4 million annually. UF purchased additional

equipment, as needed to meet this anticipated demand. Dana, however, never purchased part 77-1049 from UF, despite UF's investment and ability to deliver that part at a competitive price. When UF inquired about part 77-1049, Noronha advised that it was phased out. UF later learned that Noronha's statement was untrue, the part was not phased out, and Dana has been sourcing it from different facilities.

72.    Upon information and belief, Dana also has provided product pricing for new business to UF that is below the actual pricing provided by other suppliers to foreclose UF from competitively pricing those parts.

73.    Dana breached the LTA at least by (a) not providing the base level of purchases from UF as required by I.b. of the LTA, (b) not purchasing 100% of the "Products" from UF, and instead obtaining Products elsewhere as required by I.a of the LTA, and (c) not providing UF with the "opportunity and assistance" to quote all Dana and Affiliates business that UF is capable of providing as required by I.c of the LTA.

***UF urges Dana to remedy its breaches, but Dana refuses.***

74.    In February 2024, Vasudeva raised with Noronha Dana's failure to deliver the sales that it promised.

75.    During a February 2024 meeting, Noronha admitted that Dana has business with other suppliers that it refuses to provide UF with an opportunity to quote (in violation of the LTA) and stated that he would send out quotes for UF's business (existing and promised) to alternative suppliers, in clear breach of the LTA.

76.    Instead of honoring its promises, Dana told Vasudeva in February 2024 that he should sell UF, now that the COVID-19 pandemic has ended and Dana no longer needs

12

Vasudeva to keep UF afloat to avoid the costs and other challenges of changing suppliers during the pandemic.

77.    UF also discovered that Dana had concealed key facts from Vasudeva. When Vasudeva confronted Dana with its broken promises, Dana claimed it could not award additional business to UF because (a) its purchase contract decisions are made by a committee, and (b) Dana had internally designated Ultra-Form as a "risk supplier" because it supplied more than 50% of its total production to Dana, preventing that committee from awarding future contracts to Ultra-Form or UF.  Dana never revealed either of these facts to Vasudeva prior to his purchasing Ultra-Form.

78.    In other words, Dana knew that its promises regarding future business in the LTA would never be fulfilled given the extent of its existing business with Ultra-Form, but it made those promises anyway to fraudulently induce Vasudeva to acquire Ultra-Form and enter into the LTA.

79.    According to Dana, the purchase contract committee requires a supplier score of 85/100 to award new business to a supplier. UF's current supplier score is 83/100. At the time of sale, Ultra-Form's supplier score was lower, as Ultra-Form sales to Dana were close to 90% of their total sales.

80.    Nowhere in the LTA is any action or obligation by Dana made contingent on decisions by the committee or on the aforementioned scores.

81.    Moreover, Dana did not correctly calculate UF's supplier score because, although when it urged Vasuveda to purchase Ultra-Form's assets it considered him a qualified supplier by considering sales from his portfolio of other companies, it then changed

course and miscalculated UF's score by considering only UF sales for non-Dana customers and disregarding the other portfolio companies' sales.

82.    In negotiating the purchase of Ultra-Form, Dana intentionally withheld the process from Plaintiffs by which future contracts would be awarded.

83.    Dana and/or its agents concealed this information from Vasudeva, both during his negotiations over the purchase of Ultra-Form and in the LTA itself.

84.    Dana and/or its agents also concealed the extent of Ultra-Form's business with Dana and that the extent of that business rendered Ultra-Form ineligible for the considerations promised.

85.    UF has been unable to secure additional projects as contemplated in the LTA because, according to Dana, UF's supplier score does not meet the minimum requirements for the committee.

86.    For example, during an in-person meeting on February 16, 2024, Noronha told Vasudeva that if he introduces UF to other divisions of Dana, they will "stay away" because of UF's categorization as a "risk supplier." But Noronha and Dana knew Ultra-Form was already a "risk supplier" when Vasudeva bought Ultra-Form's assets and when Dana promised to facilitate and assist Vasudeva and UF in bidding on new Dana business.

87.    Dana knew, when it made these promises to assist UF in securing more Dana business, that UF would not, in fact, be considered for that business because of this undisclosed supposed "supplier risk" scoring system. Dana intentionally withheld this information from Vasudeva and UF.

88.     Had Vasudeva known that Dana intended to withhold business from UF based on these factors, he never would have agreed to purchase Ultra-Form's assets or enter into the LTA – the very motivation for which was *more* business from Dana, not less.

89.     Vasudeva has complained to Dana on numerous occasions that UF needed the opportunity to secure additional business from Dana, as Dana had repeatedly promised. For example, Vasudeva made these requests during in-person meetings with Dana on August 16, 2023, October 25, 2023, and February 16, 2024, as well as in multiple phone calls with Dana during this same timeframe. All of Vasudeva's requests have been ignored by Dana.

90.     Pursuant to the LTA, on May 13, 2023, Vasudeva formally notified Dana in writing of the foregoing disputes and on May 14, 2023, he met with Dana to negotiate in good faith their resolution. Dana refused to offer anything to remedy their contractual breaches and other violations of law.

91.     On May 27, 2024, Vasudeva wrote a letter to Dana identifying the unresolved concerns.

92.     Noronha responded in writing on behalf of Dana on June 3, 2024, denied wrongdoing and refused to remedy its breaches and other violations of law.

93.     Dana has left UF and Vasudeva with no choice but to seek judicial relief.

**Count One**
***Fraud/Fraudulent Inducement/Fraudulent Concealment***

94.     Plaintiffs incorporate all preceding paragraphs as if fully reinstated herein.

95.     Dana, by and through its agents, made fraudulent inducements, representations, concealments, and promises to Vasudeva and UF, including, but not limited to, overstating the amount of sales that Vasuveda would obtain if he purchased Ultra-Firm, promising to maintain existing levels of business with UF, promising to award $2 million in

15

new business, promising a last right of refusal for UF to bid on parts that it was capable of supplying, promising to provide the opportunity and assistance for new business, and fraudulently concealing the supplier scoring system that Dana would later claim forecloses it from awarding new business to UF.  Dana never intended to honor any of these promises.

96.     These fraudulent inducements, representations, concealments, and promises were material to Vasudeva's and UF's decision to purchase Ultra-Form and enter into the LTA, which they never would have done but for those inducements, representations, concealments, and promises.

97.     Dana, through its agents, made these fraudulent inducements, representations, concealments, and promises knowing they were false and/or with utter and reckless disregard for their truth or falsity.

98.     Dana, and/or its agents, intended to mislead Vasudeva and UF by these fraudulent inducements, representations, concealments, and promises so as to induce him to purchase Ultra-Form and to enter into the LTA.

99.     Vasudeva and UF justifiably relied on the fraudulent inducements, representations, concealments, and promises of Dana and its agents, thereby damaging UF and Vasudeva, including at least the loss of sales and profits, missed business and sales opportunities, loss of money invested in UF and in the Dana business, and incurring ongoing losses to Vasudeva and his other businesses as a result of diverting effort and resources to UF.

100.    Vasudeva has further been damaged personally by Dana's fraudulent inducements, representations, concealments, and promises at least by injecting millions of his own money into the UF business and not making a salary or any distribution from UF.

16

## Count Two
### *Breach of Contract*

101.    Plaintiffs incorporate all preceding paragraphs as if fully reinstated herein.

102.    In December 2020, UF and Dana executed the LTA, which is a legally binding agreement between them.

103.    UF has fulfilled its obligations under the LTA.

104.    Vasudeva and UF executed the purchase of Ultra-Form's assets and invested significant financial resources in upgrades and necessary actions to maintain production on for Dana and fulfill its obligations under the LTA.

105.    Dana has breached the LTA in myriad ways, including without limitation:

    A.    Dana has purchased parts subject to the LTA from other suppliers, despite being obliged to purchase 100% of its requirements from UF.

    B.    Dana failed to maintain the minimum monthly purchases for the six months following the acquisition of UF.

    C.    Dana failed to provide UF with the "opportunity and assistance" to bid for additional Dana business.

    D.    Dana failed to provide UF with the last right of refusal for additional work prior to Dana making a sourcing decision.

106.    Dana's conduct, as described above, also has breached the implied covenant of good faith and fair dealing.

107.    Plaintiffs were damaged as a direct result of Dana's breaches, including (without limitation) by losing sales and profits to which the LTA entitled UF, missing out on business and sales opportunities, purchasing Ultra-Form's assets as required by the LTA at

great financial expense, as well as incurring ongoing losses to Vasudeva's other businesses as a result of diverting effort and resources to UF.

### Count Three
### *Promissory Estoppel*

108.    Plaintiffs incorporate all preceding paragraphs as if fully reinstated herein.

109.    Dana, by and through its agents, made clear and unambiguous promises to Vasudeva and UF, including (without limitation) the pre-contract promise to provide at least $2 million in annual sales of new business.

110.    It was reasonable and foreseeable for Vasudeva and UF to rely on Dana's promises.

111.    Vasudeva and UF relied on these promises and were damaged at least by purchasing the assets of Ultra-Form, upgrading equipment, investing in UF in anticipation of future purchases, and entering into the LTA.

112.    Vasudeva and UF were damaged by their reliance as explained above and having expended significant financial resources to fulfill orders that Dana never intended to make.

### Count Four
### *Unjust Enrichment*

113.    Plaintiffs incorporate all preceding paragraphs as if fully restated herein.

114.    Vasudeva and UF conferred a benefit upon Dana at least by purchasing Ultra-Form's assets and providing Dana with a reliable supply of PPAP-certified parts during a tumultuous time and avoiding the millions of dollars in payments and risks associated with obtaining new PPAP certifications for a new supplier or suppliers.

115.    Without the conferral of those benefits, Ultra-Form's inability to supply Dana's part manufacturing needs would have resulted in severe reputational and financial damages to Dana.

116.    Dana has continued to benefit from this supply of certified parts, enabling it to fulfill obligations to automobile manufacturers.

117.    Dana knew about these benefits and, in fact, obtaining those benefits was its intent.

118.    Dana has retained these benefits under circumstances, described above, where it would be unjust to do so without payment.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for judgment against Dana as follows:

(A)    Compensatory damages, including (without limitation) actual damages, lost profits, compensatory, and special damages in an amount to be determined at trial.

(B)    An accounting and disgorgement of Dana's ill-gotten profits.

(C)    All unjust enrichment conferred upon Dana.

(D)    Any and all appropriate relief or remedy under tort, contract, quasi-contract, and equity, including (without limitation and without any election of final remedies) rescission, restitution, compensatory damages, consequential or special damages, specific performance, injunctive relief, and/or reformation.

(E)    Punitive and exemplary damages.

(F)    Attorneys' fees and litigation expenses.

(G)    Pre-judgment and post-judgment interest.

(H)    Costs.

34393671.2

(I)     Such other and further relief as allowed at law or in equity that the Court deems to be appropriate.

Dated:  November 1, 2024

  s/ Matthew J. Cavanagh
Matthew J. Cavanagh (OH 0079522)
Benjamin J. Foote-Huth (OH 0104192)
MCDONALD HOPKINS LLC
600 Superior Avenue, East, Ste. 2100
Cleveland, Ohio 44114
t 216.348.5400 │ f 216.348.5474
mcavanagh@mcdonaldhopkins.com
bfootehuth@mcdonaldhopkins.com

*Counsel for Plaintiffs*

20

## **Jury Demand**

Plaintiffs hereby demand a jury trial for all issues so triable.

 s/ Matthew J. Cavanagh
*Counsel for Plaintiffs*